**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**BARBARA ACETO,**

                                        **Plaintiff,**


            v.                                          **6:08-CV-169**
                                                        **(FJS)**


**COMMISSIONER OF SOCIAL SECURITY,**


                                        **Defendant.**
_____

**APPEARANCES**                                **OF COUNSEL**

**BARBARA ACETO**
Frankfort, New York 13340
Plaintiff _pro se_



**SOCIAL SECURITY ADMINISTRATION**              **SUSAN J. REISS, SAUSA**
**OFFICE OF GENERAL COUNSEL**
26 Federal Plaza, Room 3904
New York, New York 10278-0004
Attorneys for Defendant

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff brought this action pursuant to the Social Security Act (the "Act"), 42 U.S.C.

§§ 405(g), 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social

Security (the "Commissioner"), denying her applications for disability insurance benefits ("DIB")

and Supplemental Security Income ("SSI"). Plaintiff requests that the Court reverse the

Administrative Law Judge's ("ALJ") decision or remand the case to a new ALJ.

Currently before the Court are Plaintiff's and Defendant's cross-motions for judgment on the pleadings or, in the alternative, for summary judgment. *See* Dkt. Nos. 18, 22.

## II. BACKGROUND

### A.     Procedural history

On February 10, 2005, Plaintiff filed applications for DIB and SSI under the Act, alleging cervical dorsal strain, neck and back sprain, arthritis and bursitis, anxiety/depression, severe headaches, pain, and nerve damage. *See* Administrative Record ("AR") at 61-65, 76. In both applications, Plaintiff alleged an onset date of August 30, 2004. *See id.* at 61, 73. The Social Security Administration ("SSA") denied Plaintiff's applications on June 16, 2005. *See id.* at 38-42, 391-93. Plaintiff thereafter filed a timely request for a hearing before an ALJ. *See id.* at 43-44. ALJ Robert E. Gale conducted that hearing in Utica, New York on May 1, 2007, at which Plaintiff appeared with a non-attorney representative and testified. *See id.* at 447.

In a decision dated May 17, 2007, the ALJ found Plaintiff not disabled and thus not entitled to DIB and SSI. *See id.* at 21-33. ALJ Gale stated that he considered all the evidence in the record and made the following findings:

> 1. Plaintiff had not engaged in substantial gainful activity since August 30, 2004, the alleged onset date.
>
> 2. Plaintiff had the following severe combination of impairments: residuals status post cervical spine fusion at C6-7, status post lumbar discectomy at L5-S1, and depression.
>
> 3. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").

4. Plaintiff had the residual functional capacity ("RFC") to perform the full range of sedentary work.

5. Plaintiff was unable to perform her past relevant work.

6. Plaintiff was born on December 7, 1962, and was forty-one years old at the alleged onset date, which is defined as a younger individual aged eighteen to forty-four.

7. Plaintiff had at least a high school education and communicated in English.

8. Transferability of job skills was not an issue because Plaintiff's past relevant work was unskilled.

9. In light of Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

10. Plaintiff had not been under a disability as defined by the Act since August 30, 2004, the alleged onset date.

*See* AR at 23-32.

The ALJ's decision became the Commissioner's final ruling on December 11, 2007, when the Appeals Council denied Plaintiff's request for review. *See id.* at 7. Notably, Plaintiff submitted additional evidence to the Appeals Council, from the following institutions: (a) St. Joseph's Hospital dated August 30, 2004, *see id.* at 394-402; (b) St. Mary's Hospital dated February 11, 2005, *see id.* at 403-11; and (c) Slocum-Dickson Medical Group, P.L.L.C. ("Slocum-Dickson") dated May 3, 2007, to October 20, 2007, *see id.* at 412-46, all of which were received in the administrative record, *see id.* at 10. *See also Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 2000) (holding that "new evidence submitted to the Appeals Council following the ALJ's

decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision").

On February 11, 2008, Plaintiff commenced this action. *See* Dkt. No. 1. Plaintiff filed a supporting brief on July 20, 2009. *See* Dkt. No. 18. The Commissioner filed an answer on June 26, 2008, and a brief in opposition on September 25, 2009. *See* Dkt. Nos. 13, 22.

## B.    Plaintiff's medical history

Dr. Fadi Joseph Bejjani, a specialist in pain and physical medicine and rehabilitation, began treating Plaintiff on August 20, 2003, for neck and back injuries that she sustained in a motor vehicle accident on February 25, 2001. *See* AR at 143. After examining Plaintiff, Dr. Bejjani diagnosed her with a cervical herniated disc at C5-6, cervical spondylosis at C5-6-7, and probable lumbar and thoracic disc displacement with radiculitis. *See id.* at 145. For her pain, Dr. Bejjani prescribed her Bextra and Lidoderm patches and gave her a neckease cervical pneumatic decompression brace and an interferential TENS unit. *See id.* He also requested magnetic resonance imagings ("MRI") of Plaintiff's lumbar spine and thoracic spine. *See id.*

On September 16, 2003, Dr. Bejjani noted that the MRI of Plaintiff's lumbar spine showed two bulging discs at L4-5 and L5-S, but the MRI of her thoracic spine was normal. *See id.* at 142. Dr. Bejjani's impressions were lumbar disc displacement with radiculitis, cervical herniated disc at C5-6, and thoracic spondylosis. *See id.* To treat Plaintiff, Dr. Bejjani administered a nonsteroidal anti-inflammatory injection and performed acupuncture. *See id.*

Approximately two months later on November 10, 2003, Dr. Bejjani administered anti-inflammatory injections in Plaintiff's left upper thoracic, left upper cervical, and right lower lumbar. *See id.* at 141. Despite the injections, Plaintiff complained of pain radiating down her left arm the following day. *See id.* at 140. Dr. Bejjani thus prescribed Valium to Plaintiff and removed her from work until November 25, 2003. *See id.* at 141, 152.

Due to Plaintiff's continued complaints of pain, Dr. Bejjani administered a cervical interlaminar epidural injection on November 17, 2003. *See id.* at 139. At two follow-up appointments in December 2003, Plaintiff reported considerable improvement in her neck due to the epidural injection. *See id.* at 136, 138. Plaintiff, however, complained of back pain and "popping" in her left acromiclavicular joint. *See id.* at 136, 138.

On November 20, 2003, Plaintiff told Dr. Cheryl Mattern, her primary care physician at Slocum-Dickson, that she "felt much better" after the epidural injection. *See id.* at 152. Plaintiff, however, complained about depression, mood swings, and difficulty sleeping. *See id.* Dr. Mattern's assessment was depression, right sided cervical radiculopathy, tobacco abuse, and degenerative disc disease; and, per Plaintiff's request, Dr. Mattern prescribed Plaintiff Lexapro, an anti-depressant medication. *See id.*

On December 3, 2003, Dr. Bejjani performed a four-level discogram on Plaintiff's back at L2-3, L3-4, L4-5, and L5-S1. *See id.* at 137. On December 31, 2003, Dr. Bejjani performed a percutaneous decompression discectomy at L5-S1. *See id.* at 135-36. Plaintiff, thereafter, had nine appointments with Dr. Bejjani between February 2004 and December 2004. *See id.* at 126-34. On February 13, 2004, Plaintiff reported being "almost pain-free and feeling much improved

in her back and neck." *Id.* at 134. In fact, Plaintiff had returned to work in January 2004 and started exercising at a gym. *See id.* at 131, 134. Plaintiff, however, reported, among other things, that she (a) stopped therapy in March 2004 due to working overtime and being busy with her children, *see* AR at 133; (b) had "good and bad days" on May 21, 2004, *see id.* at 131; (c) experienced significant pain in her knees, shoulder, and neck on July 8, 2004, *see id.* at 130; and (d) had been working overtime and had a bout of depression on August 3, 2004, *see id.* at 129. On November 3, 2004, Plaintiff complained about neck and back spasms and a seven-out-of-ten pain level in her neck and arms, which Dr. Bejjani treated with cervical and caudal epidural injections. *See id.* at 174.

On July 8, 2004, Dr. Timothy J. DelMedico, a chiropractor, evaluated Plaintiff's health status and treatment effectiveness. *See id.* at 166. Dr. DelMedico's objective findings included, among other things, (a) positive bilateral nerve root compression; (b) moderate tenderness to spine palpation; (c) full flexion, extension and lateral flexion of the cervical spine; (d) decreased rotation of the cervical spine; and (e) normal range of motion of the lumbosacral spine. *See id.* at 166-67. Dr. DelMedico's treatment plan included an Activator adjustment at Plaintiff's lumbar region, electronic muscle stimulation of the spine, and hot packs. *See id.* at 167. Although Dr. DelMedico wanted to see Plaintiff two times per week for six months, Plaintiff inconsistently attended her appointments. *See id.* at 168-71.

On August 30, 2004, Plaintiff voluntarily went to St. Joseph's Hospital Health Center in Syracuse, New York for her depression. *See id.* at 394-402. Plaintiff explained that, because of multiple life stressors, including financial uncertainty, a misbehaving teenage daughter, and a

brother being deployed to Iraq, she drove approximately sixty-five miles from her home in Frankfort, New York to Syracuse, New York to escape. *See id.* Dr. Laura Leso, a psychiatrist in the hospital's Comprehensive Psychiatric Emergency Program, examined Plaintiff and diagnosed her with depression and chronic pain. *See id.* at 304-05. Dr. Leso recommended outpatient therapy and prescribed Plaintiff anti-depressant medication. *See id.* at 394.

As a result of Plaintiff's behavior on August 30, 2004, Dr. Mattern removed Plaintiff from work. *See id.* at 128. According to treatment notes dated September 23, 2004, Dr. Mattern continued to keep Plaintiff out of work until she met with her psychiatrist, Dr. Suresh Rayancha, and her counselor, Deborah Royce, LCSW-R. *See id.* at 128, 160, 348. Dr. Mattern also advised Plaintiff to call 9-1-1 or go to an emergency room if she had suicidal thoughts. *See id.* at 160.

On October 5, 2004, Dr. Rayancha examined Plaintiff and diagnosed her with non-specified depression and posttraumatic stress disorder ("PTSD"). *See id.* at 172-73. Dr. Rayancha further opined that Plaintiff's physical pain aggravated her depression and caused flashbacks to her motor vehicle accident. *See id.* at 173. Consequently, Dr. Rayancha prescribed Plaintiff a new anti-depressant medication and advised her to continue the Valium for her pain and anxiety. *See id.*

On November 9, 2004, Plaintiff returned to Dr. Rayancha for medication management and psychotherapy. *See id.* at 178, 265. Plaintiff reported that the anti-depressant medication provided some improvement in her depression and anxiety but that her pain was still causing suicidal thoughts and aggravating her depression. *See id.*

Dr. Raymond Bepko, a psychologist, began treating Plaintiff on November 11, 2004, for

chronic pain, depression, and anxiety.  *See id.* at 179-82.  After interviewing Plaintiff, Dr. Bepko

diagnosed Plaintiff with major depression and a pain disorder associated with a general medical

condition and psychological factors.  *See id.* at 182.  Dr. Bepko noted that "[s]tress plays a very

significant role in her experience of pain as does her thinking about her situation and her attempts

at managing her daily activity."  *Id.*  To help reduce and manage Plaintiff's pain, Dr. Bepko's

treatment plan included cognitive behavioral therapy, pain and stress management techniques,

and psycho-physiological self-regulation training.  *See id.*  Dr. Bepko opined that Plaintiff could

achieve significant pain relief provided she stayed in treatment and made a good faith effort.  *See*

*id.* at 182.  Thereafter, Dr. Bepko noted that Plaintiff showed progress at two of five subsequent

cognitive behavioral therapy sessions he held with Plaintiff between November 23, 2004, and

January 13, 2005.  *See id.* at 186-90.

     Moreover, Plaintiff visited Dr. Rayancha eight times between January 4, 2005, and

December 28, 2005, for psychotherapy.  *See id.* at 176-77, 255-61, 263-6.  Although Plaintiff

generally complained about depression, anxiety, mood swings, and flashbacks to her motor

vehicle accident, she often commented that medication lessened these feelings.  *See id.*  Plaintiff

denied being suicidal but she reported that her pain aggravated her depression and anxiety and

that she had irregular appetite and sleep patterns.  *See id.*  To treat Plaintiff, Dr. Rayancha

prescribed several different anti-depressant medications to find her the greatest relief.  *See id.*

     On February 11, 2005, Plaintiff left home because she felt anxious, depressed, and

stressed over her finances and losing her job.  *See id.* at 175, 262, 404, 407.  She drove aimlessly

and contemplated suicide, but she ultimately presented at the New York State Police barracks for

help.  *See id.* 175, 185, 206, 262, 404, 407.  The police brought her to St. Mary's Hospital's emergency room in Amsterdam, New York, where she was diagnosed with recurrent major depression.  *See id.* 175, 185, 262, 404, 406, 407, 409.  Dr. Rayancha was consulted; and he took Plaintiff off Wellbutrin, an anti-depressant medication that he had first prescribed one week prior.  *See id.* at 175, 185, 406.

Plaintiff returned to Slocum-Dickson on March 3, 2005, complaining about depression, anxiety, and suicidal ideation with no plan.  *See id.* at 351.  According to the treatment notes of Deborah Morris, a nurse practitioner at Slocum-Dickson ("NP Morris"), Plaintiff was taking and/or using  (a) anti-depressant medication daily; (b) hydrocodone three to five times per day for her neck and back pain; (c) Valium two to three times per day; (d) Lidoderm patches; and (e) an inferential TENS unit.  *See id.*  NP Morris found deteriorations in Plaintiff's depression, lumbar disc displacement, and cervical radiculopathy.  *See id.* at 352.  NP Morris called Dr. Rayancha to discuss Plaintiff's mental health but spoke with his colleague, Dr. Nalin K. Sinha.  *See id.* at 177, 352.  Dr. Sinha and NP Morris opined that Plaintiff should be admitted to Faxton-St. Luke's Healthcare's psychiatric unit.  *See id.* at 175, 177, 352.  Plaintiff, however, resisted admission, claiming that she only needed help for her pain because it was causing her depression and anxiety.  *See id.* at 175.

On March 8, 2005, Plaintiff saw Dr. Bejjani for her back and neck pain, which she rated a four-out-of-ten pain level.  *See id.* at 123.  MRIs taken of Plaintiff's cervical spine and lumbar spine on February 21, 2005, showed no new abnormalities.  *See id.* at 365-66.  Specifically, the cervical spine MRI showed post-surgical changes with stable interbody fusion at C6-7 and stable

bone spurs and ridging at C5-6. *See id.* at 123, 365. The lumbar spine MRI showed little change with small disc protrusions at L4-5 and L5-S1 levels with possible posterior annular tear at L4-5 and bone spurring at L5-S1 extending into the intervertebral foramen bilaterally. *See id.* at 366. As such, Dr. Bejjani diagnosed Plaintiff with cervical and lumbar disc displacement with radiculitis and a pain disorder causing psychological and medical consequences. *See id.*

On April 5, 2005, Dr. Dennis Noia, a consultative psychologist, examined Plaintiff and noted in his medical source statement that she was vocationally capable of (a) understanding and following simple instructions; (b) performing simple tasks independently and some complex tasks with supervision; (c) maintaining attention and concentration; (d) learning new tasks; (e) making appropriate decisions; (f) relating to and interacting appropriately with others; and (g) attending to a routine and maintain a schedule, but not regularly because of medical problems. *See id.* at 207-11. Dr. Noia noted, however, that Plaintiff had difficulty handling stress and that her medical problems prevented her from maintaining a regular routine and schedule. *See id.* Dr. Noia diagnosed Plaintiff with PTSD and cervical, lumbar, and thoracic pain. *See id.* at 210.

Dr. James Naughten, a consultative family practice physician, also examined Plaintiff on April 5, 2005. *See id.* at 212. According to his medical source statement, Plaintiff had no restrictions in seeing, hearing, talking, standing, walking, climbing stairs, and bending, but she had mild restrictions with lifting, carrying, pushing, pulling, reaching, and handling objects. *See id*. at 212-15. Dr. Naughten diagnosed Plaintiff with neck and back pain secondary to a herniated disc at C5-C6, history of C6-C7 spinal fusion, degenerative disk disease, and depression. *See id.* at 215.

On April 25, 2005, Dr. James Alpert, a State agency psychiatrist, reviewed Plaintiff's medical records and completed a Mental RFC Assessment Form and a Psychiatric Review Technique Form. *See id.* at 28. In the mental RFC assessment, Dr. Alpert found Plaintiff to be "not significantly limited" to sustain work in all but three functional areas. *See id.* at 230-31. Specifically, he found that Plaintiff was "moderately limited" in her ability to (a) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number of breaks; (b) respond appropriately to workplace changes; and (c) set goals and plans independently of others. *See id.* at 231. Dr. Alpert further noted that, although Plaintiff had moderate limitations in her stress tolerance, she had "the mental RFC associated with the ability to sustain work[, and s]he [could] use judgment and adapt to changes in the workplace." *See id.* at 233. In the psychiatric review technique form, Dr. Alpert found that Plaintiff had a non-specified depressive disorder and PTSD, which constituted medically determinable impairments but did "not precisely satisfy the diagnostic criteria" for Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). *See id.* at 219, 221. Dr. Alpert further opined that Plaintiff's depression and PTSD caused her (a) mild restrictions in daily living activities; (b) mild difficulties in maintaining social functioning; (c) moderate difficulties in maintaining concentration, persistence, or pace; and (d) no episodes of decompensation. *See id.* at 27, 226.

In an undated physical RFC assessment,[1] G. Chapela,[2] a non-physician disability analyst

---

[1] The ALJ noted that the physical RFC assessment occurred sometime in April or May 2005. *See* AR at 28.

[2] Since the signature of G. Chapela is illegible, the first name and sex of this individual is
(continued...)

for SSA, found that Plaintiff (a) could lift and/or carry twenty pounds occasionally and ten pounds frequently; (b) could sit, stand and/or walk about six hours in an eight-hour work day; (c) had an unlimited ability to push and/or pull using all extremities; (d) needed to avoid repetitive overhead reaching due to her cervical spine disorder but had no other manipulative limitations; and (e) had no postural visual, communicative or environmental limitations. *See id.* at 234-39. G. Chapela also found Plaintiff's allegations of her functional limitations to be not credible. *See id.* at 238.

On April 25, 2005, x-rays were taken of Plaintiff's cervical and lumbar spines. *See* 362-64. The cervical spine x-ray revealed post-surgical changes at C6-C7, degenerative changes at C5-C6, and no evidence of prevertebral soft tissue swelling or subluxation. *See id.* at 364. The lumbar spine x-ray showed dextroscoliosis and degenerative changes. *See id.* at 363. Additionally, x-rays were taken of Plaintiff's left knee on June 6, 2005, which revealed no evidence of an acute fracture, dislocation, chondrocalcinosis, or joint effusion. *See id.* at 343, 362-64. Bony mineralization in the knee also appeared to be within normal limits. *See id.*

On August 3, 2005, Dr. Martin Morell, a rheumatologist, and Judith Balch, a nurse practitioner ("NP Balch"), began treating Plaintiff for pain, fatigue, and stiffness in her shoulders, hips, and left knee. *See id.* at 275-77. Dr. Morell examined Plaintiff, finding that she had, among other things, (a) positive impingement in the left shoulder; (b) adequate range of motion in the right shoulder; (c) intact deep tendon reflexes in the upper and lower extremities; (d) bilateral trochanteric hip pain; (e) adequate flexion and extension in the knees; and (f) severe

_____

[2](...continued)
unknown. *See* AR at 239

-12-

creptius in the left knee. *See id.* at 276. He thus diagnosed Plaintiff with osteoarthritis, bilateral trochanteric bursitis, and left shoulder bursitis, and administered steroid injections in her left shoulder and left knee for which she reported immediate relief. *See id.*

On August 23, 2005, Plaintiff told NP Balch that she felt pain relief in her shoulder and knee after the steroid injections. *See id.* at 274. NP Balch examined Plaintiff, finding that she had an adequate range of motion in the shoulders, no synovitis, adequate internal and external hip rotation, no hip pain, and creptius in the knees but no effusion. *See id.* NP Balch further noted that a recent x-ray of Plaintiff's hips was unremarkable. *See id.* As such, NP Balch diagnosed Plaintiff with chronic pain/fibromyalgia, degenerative disc disease, and osteoarthritis; and she prescribed Plaintiff Zanaflex, a muscle relaxer. *See id.*

Plaintiff returned to Slocum-Dickson between September 2005 and December 2005 for three routine appointments. *See id.* at 328-37. Her chief complaints included depression, insomnia, and neck, back, and shoulder pain. *See id.* at 328, 332, 335. Psychiatric examinations generally revealed anxiety and depression but intact judgment, insight, and memory and orientation to time, place, and person. *See id.* at 329, 333, 336. In addition, musculoskeletal examinations showed pain restrictions in Plaintiff's neck, back, and upper extremities as well as significant muscle spasms and tenderness. *See id.*

On December 8, 2005, Plaintiff complained about left shoulder pain to NP Balch. *See id.* at 272-73. Although the examination revealed a decreased range of motion in the left shoulder with positive impingement and creptius in the knees, it showed an adequate hip rotation and no lower leg edema. *See id.* at 272. NP Balch's diagnostic impression, therefore, was left shoulder

-13-

tendonitis, chronic pain, fibromyalgia, degenerative disc disease, and osteoarthtis. *See id.* NP

Balch made similar findings at Plaintiff's appointment four months later. *See id.* at 270-71.

On March 13, 2006, Elizabeth J. Youngs, a nurse practitioner at Slocum-Dickson ("NP

Youngs"), examined Plaintiff at a routine appointment. *See id.* at 325-27. According to NP

Youngs' treatment notes, Plaintiff denied feeling like life was not worth living, wishing she were

dead, and having thoughts about ending her life. *See id.* at 325. Although Plaintiff's judgment,

insight, and memory were intact, NP Youngs found Plaintiff had a depressed mood. *See id.* at

326. In addition, Plaintiff's pain caused mild motion restrictions in her neck and lower

extremities. *See id.* at 326-27.

According to a letter dated June 28, 2006, physicians at the Bonati Institute in Tampa

Bay, Florida reviewed Plaintiff's films and preliminarily found (a) bulging discs at L4-5, L5-S1,

C5-6, C6-7, and C7-T1; (b) spurring at C6-7; (c) degenerative disc disease at L1-2, L3-4, L5-S1,

and C7-T1; (d) forminal narrowing at L4-5, L5-S1, C5-6, C6-7, and C7-T1; (e) degenerative

facet disease at L4-5 and L5-S1; and (f) a normal thoracic spine. *See id.* at 240. The physicians

stated, however, that they would perform a full clinical evaluation and provide a complete

diagnosis after they examined Plaintiff. *See id.*

Plaintiff continued psychiatric treatment with Dr. Rayancha between July 1, 2006, and

December 20, 2006. *See id.* at 249-54. During this time, Plaintiff generally denied suicidal

ideation, noted a decrease in her flashbacks, and saw some improvement with her depression.

*See id.* at 249, 250-53. Nonetheless, she reported experiencing anxiety when someone other than

herself drove, having irregular sleep and appetite patterns, and undergoing financial and physical

-14-

stress.  *See id.* at 249-50.

At a routine appointment with Dr. Mattern on September 7, 2006, Plaintiff complained about severe lower back pain.  *See id.* at 299.  Plaintiff expressed frustration with the lack of pain control and relief she had received from a pain clinic.  *See id.*  Plaintiff alleged that the pain clinic told her that "they ha[d] run out of options for her from a med[ical] standpoint," but Plaintiff felt they "ha[d] not tried much yet."  *Id.*  A physical examination confirmed that Plaintiff suffered from pain, moderate tenderness, and mild restrictions in her back.  *See id.* at 300.  Also, although Plaintiff had intact judgment and insight and was oriented to time, place, and person, she had a depressed and labile mood.  *See id.*

On September 22, 2006, Dr. Mattern noted "no real change" in Plaintiff's physical examination and in MRIs taken of Plaintiff's cervical spine and lumbar spine on September 12, 2006.  *See id.* at 241, 291, 296, 360.  Specifically, the cervical spine MRI  revealed uncovertebral degenerative change at C5-6 with neural forminal narrowing mild to moderate in degree bilaterally.  *See id.* 241, 360.  The MRI also showed stable disc protrusions/herniations at C7-T1 and T1-2.  *See id.*  Additionally, the lumbar spine MRI showed (a) a small disc protrusion/herniation at L4-5 with mild lateral recess narrowing; (b) mild neural forminal narrowing at L5-S1; and (c) a diffused annular bulging disc at L4-5 without focal herniation but with disc material extending into the neural foramen.  *See id.* at 242, 361.

Dr. Eufrosina Young, a neurosurgeon at Slocum-Dickson, reviewed an MRI of Plaintiff's brain on October 16, 2006, and found it to be normal.  *See id.* at 245.  Dr. Young neither found "episodes of altered conscious" nor a need to prescribe Plaintiff seizure medication.  *See id.* at

245, 247.  Dr. Young noted, however, that Plaintiff had been experiencing daytime

hypersomnolence due, in part, to her pain medications.  *See id.* at 247.

On November 28, 2006, Dr. Mattern commented that Plaintiff "continue[d] to be 100%

disabl[ed]."  *See id.* at 294.  Dr. Mattern noted that Plaintiff was scheduled for a sleep study due

to possible narcolepsy.  *See id.*  Dr. Mattern's assessment of Plaintiff's conditions included

deteriorated cervical radiculopathy, improved insomnia, and unchanged depression, lumbar disc

displacement, and hypersomnia.  *See id.*

On November 30, 2006, and March 7, 2007, Dr. Morell's examinations of Plaintiff

revealed a normal range of motion in her hips but a decreased range of motion in her left

shoulder and left knee.  *See id.* at 266, 268.  Dr. Morell administered steroid injections in

Plaintiff's left knee and left shoulder and instructed her to continue her medications.  *See id.* at

267, 269.  In addition to chronic pain/fibromyalgia, chronic fatigue syndrome, degenerative disc

disease and osteoarthritis, Dr. Morell diagnosed Plaintiff with tendonitis and radiculopathy.  *See

id.*  Additionally, x-rays of Plaintiff's left and right knees taken on March 7, 2007, were

unremarkable.  *See id.* at 267, 278.

Per Dr. Mattern's referral, Dr. Clifford Soults, a neurosurgeon, examined Plaintiff on

December 11, 2006, for her back pain.  *See id.* at 243-44.  After reviewing previous MRIs of

Plaintiff's cervical spine and lumbar spine, Dr. Soults found degenerative changes but no frank

disc herniation or neuroforaminal impingement.  *See id.* at 243.  Dr. Soults did not recommend

neurosurgery.  *See id.*

On January 29, 2007, Dr. Mattern noted that Plaintiff was under investigation for child

abuse because her teenage daughter commented that Plaintiff was addicted to pain medications at school. *See id.* at 290. Dr. Mattern further noted that, during a verbal confrontation between Plaintiff's spouse and teenage daughter, Plaintiff went under her bed to sleep so nobody would bother her. *See id.* Plaintiff's daughter thereafter informed school officials that her mother was hiding under the bed. *See id.*

On February 22, 2007, Plaintiff reported to Dr. Rayancha that she lacked motivation, had not showered in a few days, was experiencing flashbacks, was affected by the winter weather, and felt depressed and anxious. *See id.* at 248. Dr. Rayancha thus continued prescribing Plaintiff Celexa, Ativan, and Gabitril for her mental health. *See id.*

On October 12, 2007, Plaintiff informed Dr. Mattern that she felt her depression had improved because her pain was under better control. *See id.* at 414. Indeed, Dr. Mattern noted that Plaintiff was "doing VERY GOOD" with her fibromyalgia medication and that she was "much less groggy–more alert and animated with less depression." *Id.* Plaintiff's physical examination, however, revealed (a) posterior tenderness, poor range of motion, and pain in her spine; (b) decreased range of motion and creptius in her neck; and (c) bilateral hyperesthesia in both arms and legs. *See id.* at 415. Dr. Mattern assessed improvement with Plaintiff's depression and lumbar disc displacement but noted no changes in her lumbar and cervical radiculopathy and left knee pain. *See id.*

# III. DISCUSSION

## A.    Standard of review

### *1. Substantial evidence*

When reviewing the Commissioner's final decision, the district court may set aside the Commissioner's non-disability determination "only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted); *see also Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir. 2004) (stating the court "must determine whether the correct legal standards were applied and whether substantial evidence supports the decision" (citation omitted)).  The court's factual review of the Commissioner's decision is limited to whether substantial evidence in the record supports the decision.  *See* 42 U.S.C. § 405(g); *see also Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).  The Supreme Court has defined substantial evidence to mean "more than a mere scintilla" of evidence and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  An ALJ must also set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *See Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir. 1984) (citation omitted).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations

omitted). A court, however,"cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision." *Scott v. Comm'r of Soc. Sec.*, No. 06-CV-481, 2009 WL 1559819, *2 (N.D.N.Y. June 2, 2009); *see also* 42 U.S.C. § 405(g).

Additionally, the district court may not affirm an ALJ's disability determination if it reasonably doubts whether the ALJ applied the proper legal standards, even if it appears that substantial evidence supports that determination. *See Pollard v. Halter,* 377 F.3d 183, 188-89 (2d Cir. 2004) (citation omitted); *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987). "'Failure to apply the correct legal standards is grounds for reversal.'" *Pollard,* 377 F.3d at 189 (quotation omitted).

### 2. Five-step disability determination

To be eligible for DIB and SSI, a claimant must show that she suffers from a disability within the meaning of the Act. The Act defines "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A). In addition, a claimant's

> [p]hysical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In evaluating DIB and SSI claims, the ALJ follows a five-step sequential evaluation process:

> First, the [ALJ] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [ALJ] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [ALJ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [ALJ] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 20 C.F.R. §§ 404.1520, 416.920.

The claimant bears the burden of proving disability at the first four steps. *See Berry*, 675 F.2d at 467. If the claimant meets this burden, then the Commissioner has the burden of proof at the fifth step. *See id.*

**B.      Plaintiff's contentions**

Plaintiff generally argues that "[t]he medical evidence is very positive that I am totally disabled from all types of work . . . All doctors I see have me as, Totally Disabled From All

-20-

Types of Work." *See* Dkt. No. 18 at 1.[3]  A liberal interpretation of this argument suggests that

Plaintiff contends that the ALJ's non-disability determination is neither supported by substantial

evidence in the record nor made in accordance with the applicable legal standards.  *See*

*Williamson v. Comm'r of Soc. Sec.*, No. 09-CV-202, 2011 U.S. Dist. LEXIS 34480, *8-*9

(N.D.N.Y. Mar. 31, 2011) (stating that a court should construe a *pro se* litigant's pleadings and

submissions liberally and interpret them "'to raise the strongest arguments that they suggest'")

(quotation omitted)).  Specifically, Plaintiff appears to argue that the ALJ

> 1. Erred in finding that her physical and/or mental impairments did not meet or medically equal an impairment detailed in the Listings;
>
> 2. Misapplied the treating physician rule and failed to develop the record fully with respect to his RFC determination;
>
> 3. Failed to apply the appropriate legal standard in evaluating her credibility as to her subjective complaints of pain; and
>
> 4. Erred in relying solely on the Grids to make his disability determination.

*See* Dkt. No. 18 at 1.


C.      **The ALJ's Step Three determination**

At Step Three of the evaluation process, the ALJ determines whether a claimant's

---

[3] Plaintiff also contends that the ALJ erred by not including in the hearing transcript (1) his alleged pre-hearing question to her regarding whether she or someone else groomed her nails; and (2) the reason she needed a break during her testimony (*i.e.*, emotional breakdown).  *See* Dk. No. 18 at 1.  Because Plaintiff's contentions have no bearing on the ALJ's non-disability determination, the Court dismisses them as meritless.  Further, Plaintiff argues that the ALJ erred by failing to consider her fiancé's sworn statement regarding her pain and depression.  *See id.* The ALJ, however, expressly summarized the contents of her fiancé's statement; and, therefore, the Court finds no merit in Plaintiff's contention.  *See* AR at 31.

impairment or combination thereof meets or equals an impairment enumerated in the Listings.[4] *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). A claimant who suffers from a listed impairment is conclusively presumed disabled, meaning the ALJ need not consider "vocational factors such as age, education, and work experience." *Berry*, 674 F.2d at 467.

If an ALJ renders an adverse determination, then he must "set forth a specific rationale" and not make a brief conclusory statement that claimant's impairment does not match any listed impairment. *Berry*, 675 F.2d at 468; *see also Rivera v. Astrue*, No. 10 CV 4324, 2012 U.S. Dist. LEXIS 118171, *34 (E.D.N.Y. Aug. 21, 2012) (noting that, without a specific rationale, a reviewing court is unable to determine whether substantial evidence supports the ALJ's decision). Failure to set forth a specific rationale, however, does not automatically dictate remand when substantial evidence contained elsewhere in the ALJ's decision supports a disability determination. *See Berry*, 675 F.2d at 468-69 (affirming the ALJ's Step Three conclusion, despite its lack of a specific rationale, because the court could reasonably infer from other evidence in the record that the claimant was not disabled); *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112-13 (2d Cir. 2010) (affirming in absence of a specific rationale because other portions of the ALJ's decision and the claimant's testimony demonstrated that substantial evidence supported the ALJ's Step Three determination). Nevertheless, the Second Circuit has cautioned that it "would not hesitate to remand the case for further findings or a clearer explanation for the decision" where it "would be unable to fathom the ALJ's rationale in relation

_____

[4] The regulations enumerate a series of impairments that "describe[] for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity[.]" 20 C.F.R. §§ 404.1525(a), 416.925(a); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." *Berry*, 675 F.2d at 469 (citations omitted).

Here, the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled one of the Listings. *See* AR at 27. To make this determination, the ALJ only relied on the Psychiatric Review Technique Form that Dr. Alpert prepared on April 25, 2005. *See id.* at 27, 216. As discussed above, Dr. Alpert found that Plaintiff's unspecified depressive disorder and PTSD neither met nor equaled any of the presumptively disabling mental impairments in Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). *See id.* He further opined that Plaintiff's depression and PTSD merely caused her (a) mild restrictions in her daily living activities; (b) mild difficulties in maintaining social functioning; (c) moderate difficulties in maintaining concentration, persistence, or pace; and (d) no episodes of decompensation. *See id.*

For the following reasons, however, the Court holds that the ALJ failed to support his Step Three determination with the requisite "specific rationale." *See Rivera*, 2012 U.S. Dist. LEXIS 118171, at *35 (remanding because the ALJ did not provide a specific rationale to support his Step Three conclusion). First, the ALJ only focused on Plaintiff's depression and PTSD; and he failed to assess whether Plaintiff's neck, back, shoulder, and knee impairments met or equaled any listed impairment. *See* AR at 27. The ALJ neither considered any listings for musculoskeletal and neurological disorders nor provided any rationale for such omissions. *See id.* Moreover, although the ALJ offered a more detailed explanation of Plaintiff's depression, he failed to apply any listed mental impairment to her condition with specificity. *See id.* The ALJ's

analysis was simply a verbatim summary of Dr. Alpert's findings. *See id.* By summarily concluding that Plaintiff's depression did not match a listed impairment and neglecting to consider Plaintiff's physical impairments, the ALJ frustrated any meaningful review by the Court. *See Ferency v. Astrue*, No. 10-CV-711, 2012 U.S. Dist. LEXIS 97582, *15 (N.D.N.Y. Apr. 30, 2012) (stating that "[m]eaningful review of the ALJ's decision is frustrated by her cursory (three-sentence) finding that Plaintiff's impairment did not satisfy § 11.04 of the Listings").

Second, the balance of the record evidence does not cure the ALJ's failure to provide a specific rationale. *See Salmini*, 371 F. App'x at 113. As described below, the ALJ failed to develop the record fully as to any treating physicians' opinions and improperly discredited Plaintiff's subjective complaints of pain. It is also unclear which evidence in the ALJ's decision would support his conclusion that Plaintiff's impairments did not meet or equal any listed impairments. *See Rivera*, 2012 U.S. Dist. LEXIS 118171, at *36. The Court, therefore, cannot "'glean the rationale of [the] ALJ's decision'" from elsewhere in his decision. *Id.* (quoting *Salmini*, 371 F. App'x at 113).

In sum, the Court concludes that the ALJ failed to provide an adequate explanation for finding that Plaintiff's physical and/or mental impairments did not meet or medically equal an impairment enumerated in the Listings. Accordingly, the Court is unable to determine whether substantial evidence supports his decision and remands the case for further consideration.

**D.    The ALJ's RFC determination**

A claimant's RFC is "the most [she] can still do despite [her] limitations."  20 C.F.R.

§§ 404.1545(a)(1), 416.945(a)(1).  When determining a claimant's RFC, an ALJ must specify the

functions (*e.g.*, sitting, standing, walking, lifting, pushing, pulling, and carrying) that the claimant

is capable of performing.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)

(citations omitted).  Conclusory statements concerning the claimant's capabilities are insufficient.

*See id.* (citations omitted).  An ALJ must assess a claimant's RFC based on all relevant evidence

in the record including physical limitations, symptoms, and other limitations that go beyond

symptoms.  *See id.*; 20 C.F.R. §§ 404.1545, 416.945.

Under the treating physician rule,[5] "[a] treating physician's opinion is entitled to controlling

weight with respect to the nature and severity of a claimed impairment if it is 'well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] record.'"  *Carvey v. Astrue*, 380 F. App'x 50, 51 (2d Cir. 2010)

(quoting 20 C.F.R. § 404.1527(d)(2)) (other citation omitted).  Affording a treating physician's

opinion controlling weight "reflects the reasoned judgment" that treating physicians are more likely

"'to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring

a unique perspective to the medical evidence that cannot be obtained from the objective medical

findings alone or from reports of individual examinations, such as consultative examinations or brief

---

[5] The discussion of the treating physician rule is based on the version of the rule in effect throughout the agency proceedings.  During the pendency of this appeal, however, the SSA revised its regulations relating to the treating physician rule to give ALJs discretion to consult other sources to supplement inconsistent or incomplete medical records from claimants' treating physicians.  *See* 76 Fed. Reg. 20282 (Apr. 12, 2011) (notice of proposed rule); 77 Fed. Reg. 10651 (Feb. 23, 2012) (notice of final rule).

hospitalizations.'" *Rivera*, 2012 U.S. Dist. LEXIS 118171, at *29 (quoting 20 C.F.R.

§ 404.1527(c)(2)).

An ALJ, however, is not bound to accord treating physicians' opinions controlling weight.

*See id.* If the ALJ assigns less than controlling weight to a treating physician's opinion, then he

must justify the alternate weight with reference to the following factors: "'"(i) the frequency of

examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in

support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether

the opinion is from a specialist."'" *Audi v. Astrue*, No. 07-CV-1220, 2009 U.S. Dist. LEXIS

90880, *40-*41 (N.D.N.Y. Sept. 30, 2009) (quotation omitted)); *see also* 20 C.F.R.

§§ 404.1527(c), 416.927(c). In addition, the ALJ must specify "'good reasons'" for the lack of

weight accorded to a treating physician's opinion. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d

Cir. 2004) (quotation and citation omitted); Social Security Ruling ("SSR") 96-2p, 1996 SSR

LEXIS 9, *12 (July 2, 1996) (stating that, when an ALJ's decision is not fully favorable to a

claimant, she must provide specific reasons for the weight given to each treating source's medical

opinion, supported by record evidence, and must state the reasons for that weight); *see also Snell

v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (stating that the "[f]ailure to provide 'good reasons' for

not crediting the opinion of a claimant's treating physician is a ground for remand" (citation

omitted)).

Notably, the treating physician rule dovetails with the ALJ's affirmative duty to develop

the administrative record. *See Pitcher v. Astrue*, No. 06-CV-1395, 2009 U.S. Dist. LEXIS

68946, *40 (N.D.N.Y. Mar. 5, 2009) (stating that if the evidence received is inadequate to render

a disability determination, then the ALJ must gather additional information by recontacting the claimant's treating physician (citations omitted)); *Dickson v. Astrue,* No. 1:06-CV-0511, 2008 U.S. Dist. LEXIS 76180, *36 (N.D.N.Y. Sept. 17, 2008) (stating that "[t]he duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations" (quotation and footnote omitted)).  Indeed, Second Circuit case law suggests that the ALJ's failure to develop the record by obtaining a treating physician's assessment of a claimant's functional capacity may warrant remand.  *See e.g.*, *McClaney v. Astrue*, No. 10-CV-5421, 2012 U.S. Dist. LEXIS 123756, *28-*29 (E.D.N.Y. Aug. 10, 2012) (remanding, in part, because the ALJ failed to seek the opinions of the claimant's treating physicians on his RFC (citations omitted)); *Lawler v. Astrue*, No. 10-cv-3397, 2011 U.S. Dist. LEXIS 132633, *21 (E.D.N.Y. Nov. 14, 2011) (stating that an ALJ's duty to develop the record includes contacting a claimant's treating physicians to obtain their opinions on his RFC) (citation omitted); *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) (holding that "[a]n ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of [the] claimant's work-related capabilities" (citation omitted)).

Upon thorough review of the administrative record, the Court finds that the ALJ misapplied the treating physician rule and failed to develop the record with treating sources' opinions on Plaintiff's functional capacity and limitations.  Regarding the treating physician's rule, the ALJ declined, without specifying good reasons, to grant controlling weight to the medical opinions of Drs. Mattern, Rayancha, Bepko, Morrell, and Mattern.  *See* AR at 31. Specifically, the ALJ afforded "limited" or "moderate" weight to (a) Dr. Rayancha's psychiatric

assessment dated October 5, 2004, *see id.* at 172-73; (b) Dr. Bepko's medical report and progress

notes from November 11, 2004, to February 17, 2005, *see id.* at 179-82, 185-90; (c) Dr.

Rayancha's medical records from November 9, 2004, to February 22, 2007, *see id.* at 248-65; (d)

Dr. Morrell's medical records from August 3, 2003, to March 7, 2007, *see id.* at 266-85; and (e)

Dr. Mattern's medical records from October 20, 2004, to March 12, 2007, *see id.* at 286-386. *See*

AR at 31. The ALJ justified this weight determination, not by referencing the factors set forth in

the regulations, but by summarily claiming that the treating sources' records merely recited

Plaintiff's complaints and offered few findings and limitations. *See id.* The ALJ also failed to

mention, let alone explain, whether the treating sources' opinions were supported by medical

evidence and/or contradicted by other substantial evidence in the record. *See Shaw*, 221 F.3d at

134 (stating that the treating physician rule "mandates that the medical opinion of a claimant's

treating physician is given controlling weight if it is well supported by medical findings and not

inconsistent with other substantial record evidence"). Additionally, as detailed below, the ALJ

improperly dismissed the treating physicians' opinions as uninformative without re-contacting

them for specific opinions on Plaintiff's functional capabilities. *See Stytzer v. Astrue*, No. 1:07-

CV-811, 2010 U.S. Dist. LEXIS 103770, *20 (N.D.N.Y. Sept. 30, 2010) (stating that "[i]t is

insufficient for the ALJ to dismiss a treating physician's opinion as 'vague' without taking any

steps to develop more specific information" (citations omitted)); *Carrier-Titti v. Astrue*, No. 06-

CV-0647, 2009 U.S. Dist. LEXIS 45925, *27-*28 (N.D.N.Y. June 1, 2009) (holding that "'the

lack of specific clinical findings in the treating physician's report [does] not, standing by itself,

justify the ALJ's failure to credit the physician's opinion'" (quotation omitted)). Since "it is

unreasonable to expect a physician to make, on his own accord, the detailed functional

assessment demanded by the Act in support of a patient seeking SSI benefits[,]" it was incumbent upon the ALJ to request a RFC assessment from any of Plaintiff's treating sources. *Ubiles v. Astrue*, No. 11-CV-6340T, 2012 U.S. Dist. LEXIS 100826, *24 (W.D.N.Y. July 2, 2012) (citations omitted).

Not only did the ALJ misapply the treating physician's rule, but he neglected to develop the record by gathering treating sources' opinions on how Plaintiff's mental and physical impairments affected her ability to perform work-related activities. *See Rivera*, 2012 U.S. Dist. LEXIS 118171, at *38-*39 (stating "[t]here are no more 'relevant facts,' *id*., than medical records and opinions of treating physicians on dispositive questions" such as a claimant's RFC (citation omitted)). Although the record contained extensive medical documentation, it lacked any statement from Plaintiff's treating physicians, namely Dr. Mattern, regarding her functional abilities to work despite her impairments. *See Stytzer*, 2010 U.S. Dist. LEXIS 103770, at *18 (stating that "[a] physician's statement is not a functional analysis if it does not offer any information regarding the crucial factors necessary to determine plaintiff's residual functional capacity" (citations omitted)). Indeed, the record lacked any conclusion from a treating source about (a) Plaintiff's ability to sit, stand, walk, reach, push, pull, bend, climb, and lift and (b) the effect of Plaintiff's mental limitations on her ability to work. *See Myers v. Astrue*, No. 7:06-CV-0331, 2009 U.S. Dist. LEXIS 61396, *9-*10 (N.D.N.Y. July 9, 2009) (concluding "that the ALJ failed to adequately develop the facts" regarding the claimant's functional limitations). The ALJ admittedly recognized gaps in the medical documentation, yet he still failed to contact any treating source for an RFC assessment. *See Anderson v. Astrue*, No. 09-CV-00094, 2010 U.S. Dist. LEXIS 59331, *10 (N.D.N.Y. May 20, 2010) (stating that the ALJ must re-contact a

treating physician when medical reports do no contain all the necessary information) (quotation omitted).  Since the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC.

Moreover, because Plaintiff was *pro se*, the ALJ had a heightened duty to develop the record.  *See Echevarria v. Sec'y of Health & Human Serv.*, 685 F.2d 751, 755 (2d Cir. 1982) (stating that the ALJ has a heightened duty """to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts""" with *pro se* claimants (quotation omitted)). The ALJ should have advised Plaintiff to supplement her medical records with a treating physician's opinion on her functional capabilities or have contacted her treating sources personally to obtain an RFC assessment.  *See Myers*, 2009 U.S. Dist. LEXIS 61396, at *9 (stating that "it was incumbent upon the ALJ to encourage plaintiff to obtain an opinion from her treating physicians.  In the alterative, the ALJ should have attempted to obtain an opinion directly from [her treating physicians]" (citing *Brathwaite v. Barnhart*, 2007 U.S. Dist. LEXIS 97656, 2007 WL 5322447, at *12 (S.D.N.Y. 2007) (holding that clarification was necessary rather than dismissing the treating physician's opinion outright, especially in light of the fact that the plaintiff was proceeding *pro se* and that no other treating physician's report appeared in the record)); *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (stating that, "[a]t a minimum, if the ALJ is inclined to deny benefits, he should advise a claimant that her case is unpersuasive and suggest that she supplement the record or call her treating physician as a witness" (citation omitted)).  In sum, the ALJ's failure to develop the record with medical opinions from Plaintiff's treating sources undercut his ability to determine Plaintiff's RFC adequately.  *See McClaney*,

2012 U.S. Dist. LEXIS 123756, at *34 (remanding, in part, because the ALJ failed to seek treating physicians' opinions on the claimant's RFC).

Accordingly, because the ALJ's RFC determination is marred by factual and legal errors, the Court remands this case for further consideration. On remand, the ALJ should attempt to obtain statements from Plaintiff's treating physicians regarding her RFC and assign appropriate weight to such opinions.

### E.    The ALJ's credibility determination

An ALJ may properly reject a claimant's subjective complaints of pain, symptoms, and limitations "'after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quotation omitted). Reviewing courts should afford deference to an ALJ's credibility determination because he heard the testimony and observed the witnesses' demeanor. *See Cohn v. Astrue,* No. 10-CV-214, 2012 U.S. Dist. LEXIS 43849, *15 (N.D.N.Y. Mar. 29, 2012) (holding that "[t]he ALJ's decision to discount Plaintiff's statements of symptoms must be accepted by a reviewing court unless it is clearly erroneous" (citation omitted)). The ALJ, however, must set forth the reasons for his credibility determination "'with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence.'" *Raynor v. Astrue*, No. 1:09-CV-227, 2011 U.S. Dist. LEXIS 117101, *5 (N.D.N.Y. Oct. 11, 2011) (quoting *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)); *see also Valet v. Astrue*, No. 10-CV-3282, 2012 U.S. Dist. LEXIS 7315, *65-*66 (E.D.N.Y. Jan. 23, 2012)

-31-

(stating that remand is appropriate "[w]here the ALJ fails sufficiently to explain a finding that the claimant's testimony was not entirely credible" (citation omitted)).

To satisfy the substantial evidence rules, the ALJ's credibility determination must be based on a two-step analysis of the pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529(b)-(c), 416.929(b)-(c). First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged[.]" 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following seven factors: (a) the claimant's daily activities; (b) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (c) precipitating and aggravating factors; (d) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve pain or other symptoms; (e) other treatment that the claimant receives or has received to relieve pain or other symptoms; (f) any measures that the claimant takes or has taken to relieve pain or other symptoms; and (g) any other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ discredited Plaintiff's written statements and testimony regarding her subjective complaints of pain and limitations. *See* AR at 28-31. Although Plaintiff's physical

and mental impairments could produce some of the alleged pain and limitations, the ALJ concluded that her allegations regarding the intensity, persistence, and limiting effects of her conditions were not entirely credible. *See id.* For the following reasons, however, the Court finds that the ALJ improperly rejected Plaintiff's subjective complaints of pain.

First, the ALJ failed to offer specific reasons for discrediting Plaintiff. Rather, he summarily concluded that "[t]here [was] considerable discrepancy between limitations, activities, pain, side effects of medication and other matters reported in the medical record when compared to the claimant's testimony and her written statements regarding activities." *See id.* at 31. To support his conclusion, the ALJ merely offered that Plaintiff "was noted by the consulting examiner to be able to get on and off the exam table without difficulty" despite her expressing limitations verbally. *See id.* This single sentence, however, does not satisfy the ALJ's duty to explain with specificity Plaintiff's lack of credibility. *See Vanhorn v. Astrue*, No. 10-CV-1023, 2012 U.S. Dist. LEXIS 57278, *23 (N.D.N.Y. Mar. 31, 2012) (stating that, "[i]f the ALJ finds that the plaintiff's pain contentions are not credible, he or she must state his reasons 'explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief'" (quotation omitted)). The ALJ also neither identified which of the three consultative examiners noted that Plaintiff "[got] on and off the exam table without difficulty," nor provided a citation to the administrative record. *See id.* at 31. Although the ALJ's conclusions may ultimately be correct, the law requires his analysis to be complete.

Second, beyond listing Plaintiff's daily activities, the ALJ did not engage in a meaningful analysis of the seven factors listed in the regulations. *See id.* at 29-31; *see also Pavia v. Astrue*,

No. 5:10-CV-818, 2012 U.S. Dist. LEXIS 137173, *41 (N.D.N.Y. Aug. 20, 2012) (remanding because the ALJ failed "to fully assess plaintiff's subjective complaints, applying the seven factors"). Specifically, in assessing Plaintiff's credibility, the ALJ neglected to consider (a) Plaintiff's attempts to mitigate her pain and her medical treatment, (b) the type, dosage, effectiveness, and side effects of her medications, and (c) additional factors that limited and restricted her functionality. *See Valet*, 2012 U.S. Dist. LEXIS 7315, at *67 (remanding because the ALJ "failed to address all of the mandatory factors set forth in the Regulations"). Indeed, Plaintiff's subjective complaints of pain were at least partially corroborated by her extensive medical history of, among other things, undergoing medical procedures, taking prescription medication, and receiving epidural and anti-inflammatory injections to control her pain. *See* AR at 125, 139, 174.

Based on the foregoing, the Court remands the case because the ALJ neither applied the proper legal standards in determining Plaintiff's credibility nor provided a sufficient rationale for his determination.

## F.     The ALJ's Step Five determination

At Step Five of the evaluation process, the ALJ considers a claimant's vocational factors (age, education, and work experience), together with her RFC, to determine whether she can perform work that exists in significant numbers in the national economy. *See* 20 C.F.R.

§§ 404.1520(g), 416.920(g).  Generally, the ALJ may rely on the Grids[6] to render his Step Five

determination.  *See* 20 C.F.R. §§ 404.1569a(d), 416.969a(d).  Exclusive reliance on the Grids,

however, "may be precluded where the claimant's exertional impairments are compounded by

significant nonexertional impairments that limit the range of sedentary work that the claimant can

perform."[7]  *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (citations and footnote

omitted).  In these circumstances, a vocational expert's testimony is needed to determine whether

jobs exist in the economy that the claimant can perform.  *See Bapp v. Bowen*, 802 F.2d 601, 603

(2d Cir. 1986).  But "the mere existence of a nonexertional impairment does not automatically

require the production of a vocational expert nor preclude reliance on the guidelines."  *Id.*

Indeed, a vocational expert's testimony is required only where "a claimant's nonexertional

impairments significantly diminish his ability to work – over and above any incapacity caused

solely from exertional limitations – so that he is unable to perform the full range of employment

indicated by the [Grids]."  *Id.*  Courts assess the need for a vocational expert "on a case-by-case

basis."  *Id.* at 605.

---

[6] The Grids classify work into five exertional categories, from sedentary to very heavy,
based upon physical abilities and strength.  *See* 20 C.F.R. § 404.1567(a).  Each exertional
category has its own grid, which considers the claimant's age, education, and prior work
experience.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 200.00(a), 404.1569.  A finding of
"disabled" or "not disabled" is thus directed when the claimant's particular characteristics are
inserted into the applicable grid category.  *See id.*

[7] Exertional limitations are "restrictions imposed by [a claimant's] impairment(s) and
related symptoms" that affect his "ability to meet the strength of jobs (sitting, standing, walking,
lifting, carrying, pushing, and pulling)."  20 C.F.R. §§ 404.1569a(b), 416.969a(b).  In contrast,
non-exertional limitations are "restrictions imposed by [a claimant's] impairment(s) and related
symptoms" that affect his "ability to meet the requirements of jobs other than the strength
demands[.]"  20 C.F.R. §§ 404.1569a(c), 416.969a(c).  They include, among other things, pain,
depression, anxiety, and inability to concentrate.  *See id.*

In this case, the ALJ relied solely on the Grids to find that Plaintiff could perform a significant number of jobs in the national economy. *See* AR at 32. Per Grid Rule 201.27, the ALJ examined Plaintiff's age, education, work experience, and RFC and found that she (a) was a younger individual at age forty-four at the time of the hearing; (b) had at least a high school education; (c) was able to communicate in English; (d) had prior unskilled work experience; and (e) had the RFC to perform the full range of sedentary work.[8] *See id*. at 17. The ALJ further concluded that Plaintiff had no non-exertional limitations, namely pain, depression, and anxiety, that significantly diminished her ability to perform sedentary work. *See id.* at 32. Based on these findings, the ALJ concluded that Grid Rule 201.27 directed a finding of "not disabled," rendering a vocational expert's testimony unnecessary. *See id.* at 32.

Substantial evidence in the record, however, does not support the ALJ's Step Five determination for two reasons. First, as detailed above, the record extensively documented that Plaintiff suffered serious, sustained pain, depression, and limited ranges of motion in her neck, back, hips, shoulders, and knees, "which could reasonably be expected to have more than a *de minimis* impact on the occupational base of unskilled sedentary work." *Vanhorn*, 2012 U.S. Dist. LEXIS 57278, at *31 (remanding the ALJ's Step Five conclusion); *see also Baggett v. Astrue*, No. 5:11-CV-0195, 2012 U.S. Dist. LEXIS 95131, *38 (N.D.N.Y. June 13, 2012) (finding error with the ALJ's reliance on the Grids given substantial evidence in the record demonstrated that the claimant suffered from pain). Second, the ALJ's reliance on the Grid framework was based on, in part, his flawed RFC determination and his failure to credit Plaintiff's subjective

_____

[8] Rule 201.27 directs a finding of not disabled for a younger individual between ages eighteen and forty-four, who graduated high school, with unskilled or no past work, and capable of performing sedentary work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

complaints of pain. *See Reinard v. Astrue*, No. 09-CV-0508A, 2010 U.S. Dist. LEXIS 69860, *31 (W.D.N.Y. July 13, 2010) (finding the ALJ's use of the Grids to be inappropriate due to his failure to give controlling weight to the treating physician's opinions and "Plaintiff's many and severely limiting exertional and non-exertional symptoms").

Accordingly, the Court finds that the ALJ's exclusive reliance on the Grids was legal error and remands for reconsideration of this issue.

## G.     Plaintiff's request for a new ALJ

Plaintiff requests, should the Court remand her case, assignment to a new ALJ. *See* Dkt. No. 18 at 4. Generally, the Commissioner decides whether to reassign a case to a new ALJ, and courts do not intervene without good reason. *See Auffant v. Comm'r of Soc. Sec.*, 1:05-CV-328, 2009 U.S. Dist. LEXIS 23223, *35 (N.D.N.Y. Mar. 23, 2009); *Henry v. Astrue*, No. 07-CV-2769, 2008 U.S. Dist. LEXIS 50903, *26 (E.D.N.Y. July 3, 2008) (holding that "[t]he selection of a new ALJ on remand . . . has been considered to be within the discretion of the Commissioner of the [SSA]"). In determining whether good reason exists, a court considers the following factors: "(1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004). Applying these factors in the instant case, the Court denies Plaintiff's request for

assignment of a new ALJ upon remand.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings is **GRANTED;** and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings is **DENIED**; and the Court further

**ORDERS** that Plaintiff's request for assignment to a new ALJ upon remand is **DENIED**; and the Court further

**ORDERS** that the Commissioner's decision is **REVERSED** and this matter is **REMANDED** to the ALJ for further proceedings consistent with this Memorandum-Decision Order pursuant to sentence four of 42 U.S.C. § 405(g); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Plaintiff and close this case.

**IT IS SO ORDERED**.

Dated: November 19, 2012
        Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge